**BOSTON & MAINE RAILROAD,**
Plaintiff,

v.

The **AETNA CASUALTY AND SURETY COMPANY,** Defendant.

Civ. A. No. 61-727-C.

United States District Court
D. Massachusetts.

Sept. 30, 1963.

Lawrence R. Cohen, Boston, Mass., for plaintiff.

Richard Wait, Choate, Hall & Stewart, Boston, Mass., for defendant.

CAFFREY, District Judge.

This is an action by the plaintiff, Boston & Maine Railroad, a Massachusetts corporation, based upon a Railroad Blanket Bond. The case was removed to this court from the Superior Court for Suffolk County by the defendant, The Aetna Casualty and Surety Company, a Connecticut corporation. The case was tried to the Court upon the basis of a pre-trial stipulation, seven documentary exhibits, and portions of the deposition of one John D. O'Connor.

I find that on July 1, 1959, Aetna executed and delivered to the B&M a "Railroad Blanket Bond," under the terms of which Aetna agreed to indemnify B&M up to $100,000 against any loss thereafter sustained by B&M because of any fraudulent or dishonest act or any culpable negligence of one or more employees of B&M. For many years prior to and during the time covered by the bond, B&M and the New York, New Haven & Hartford Railroad operated, in Worcester, Massachusetts, a joint freight facility, pursuant to a contract executed on January 1, 1948 which provided that the facility be manned and actually operated by employees of the New Haven. Costs of the facility are allocated according to a formula spelled out in the contract.

During the period 1958 to 1960, the Freight Agent at the joint facility was John D. O'Connor, an employee of the New Haven for over twenty years. His duties included general supervision of the freight house and freight office, seeing to it that freight was handled properly, that freight cars were properly placed, and that freight was delivered to consignees pursuant to the terms of applicable shipping documents.

One of the concerns to which freight was regularly shipped over the B&M was the Gardner Beef Company, which had its own siding near the joint freight facility. All shipments of fresh meat to Gardner were on "order-notify" bills of lading, that is, bills of lading which listed the shipper as both consignor and consignee, coupled with an instruction to the carrier to notify Gardner when the car arrived at Worcester. Normally the consignor forwarded the original of these order-notify bills of lading to a bank in Worcester, and upon receipt of notice that a particular car had arrived in Worcester, Gardner would obtain the bill of lading from the bank (presumably after paying the bank the value of the shipment) and then surrender it to the Railroad. The rules in force forbade delivery of the car by the Railroad to Gardner unless it had received from Gardner the original of the bill of lading. This rule was subject to one exception and this one exception was routinely taken advantage of by Gardner. Gardner had posted with the Railroad a bond in the amount of $125,000 and this permitted, without prior surrender of the appropriate bill of lading, delivery by the Railroad to Gardner of cars valued in an aggregate of not more than $125,000, provided that Gardner surrendered to the B&M each bill of lading within five days, exclusive of Saturdays and Sundays, after the freight car covered by that bill of lading was placed on Gardner's siding. The Railroad was not permitted to deliver a car to Gardner if at any time the bill of lading on any other car previously delivered to Gardner was then outstanding for a period in excess of five days. Nor was the Railroad permitted to deliver any car to Gardner if the aggregate of the delivered but unpaid-for freight exceeded $125,000. The provision in Rule 7 of the Uniform Freight Classification made the bond inoperative if the Railroad violated either of these two conditions.

In a letter dated August 19, 1958, from one J. E. Hines of the B&M Credit Bureau, O'Connor was advised that Gardner was not complying with the five-day requirement on the surrender of bills of lading, and O'Connor was instructed to tighten up his supervision over deliveries to Gardner. On October 22, 1958, by a letter from S. H. Harriman, Assistant Auditor of Review, B&M, O'Connor was again advised that the handling of shipments traveling to Gardner on "order-notify" bills of lading was "very unsatisfactory."

O'Connor "shut off" Gardner from receiving any additional freight in 1958 upon receipt of the letter from Hines, at which time unpaid-for shipments actually delivered to Gardner had reached a total of $195,000. After Gardner made appropriate payments, deliveries were resumed. Following receipt of the Harriman letter, O'Connor (who previous thereto had delegated to his assistants the responsibility for keeping track of the Gardner account) decided to personally police the account and thereafter he maintained a record book in which he entered the number of the car, the value of the car, and the date it was placed on Gardner's siding. From time to time O'Connor "shut off" Gardner whenever the aggregate of unpaid freight exceeded or closely approached the sum of $125,000. Each time that this happened they were shut off until they brought themselves within the conditions of the bond. O'Connor testified that this went on pretty steadily and that he would find out probably every week or two weeks that Gardner had fallen out of compliance with the conditions of the bond, at which time he would "shut them off" until they complied.

In September 1960, O'Connor discovered that with reference to Gardner "things were getting worse" and that they owed approximately $135,000. On September 6, 1960, the day after Labor Day, O'Connor went to Isadore and Joseph Solomon, the two executives who operated Gardner Beef, told them that they were over their bond, and advised them that he "was not going to have anything more to do with them until such time as they got down and wanted to operate the way they were supposed to operate." The Solomons advised O'Connor that they would go to see Mr. McGinnis, the President of B&M, about this matter. After this meeting O'Connor returned to his office and called William Wedge who, according to the stipulation, was plaintiff's Regional Sales Manager in charge of freight traffic work for the Worcester, Fitchburg and Holyoke area from and after November 1959. Counsel stipulated that if O'Connor appeared at the trial as a witness he would testify substantially as he did on deposition and that his testimony is true. O'Connor said that he called Wedge because "he was the fellow that solicited business" and "because my shutting off his concern would result in the loss of traffic to the Boston & Maine and I thought he should know and I was also pretty sure that if I notified him he would also notify his people in Boston."

Wedge represented to O'Connor that he would call McGinnis and advise McGinnis that Solomon was going in to see him. Thereafter, O'Connor was told by Solomon that he had gone to see McGinnis, and the following day O'Connor received a telephone call at his home from Wedge in which Wedge said to O'Connor, "John, I just got through talking to Mr. McGinnis and he wants to keep these people in business until such time as he can straighten them out." O'Connor rejoined, "You can't do that," to which Wedge replied, "Well, *it is out of your hands now*. It is *strictly my responsibility* and you keep me informed, so I in turn can keep Mr. McGinnis informed." (Emphasis added.)

Thereafter, O'Connor made no attempt to keep Gardner in compliance with the terms of the $125,000 bond but he did continue to keep his running record of deliveries to and payments by Gardner and reported the status of the Gardner account to Wedge by telephoning Wedge in Holyoke about once a week. This condition continued until about November 7, 1960, when according to O'Connor "things blew up," i. e., Gardner Beef Company

went into bankruptcy at this time owing order-notify shippers of meat via B&M a sum in excess of $160,000. Exhibit 4, the validity of which is not challenged, establishes that as of March 6, 1961 the B&M had made restitution to these shippers in an aggregate amount of over $130,000 and had conceded liability of $31,000 to one additional then unpaid shipper.

The Proof of Claim filed by the B&M and the Complaint in the instant case both disclose that the claim of liability is premised on the theory that O'Connor, in acting as he did, committed culpable negligence as defined in the bond. Culpable negligence, in the context of the above-stated facts, means failure by O'Connor to exercise that degree of care and caution which a man of ordinary prudence and intelligence would usually exercise in regard to his own affairs of the same or similar character to that involved herein. O'Connor's responsibility to use *any* degree of care toward B&M freight moving through the joint terminal devolves on him derivatively through the contract between his employer, the New Haven, and the B&M. Absent this contract, O'Connor, as a New Haven employee, would be a stranger to all B&M traffic and property, and would have neither rights nor obligations with reference thereto. The contract in evidence contemplates that as Freight Agent for the joint facility, O'Connor would supervise all B&M freight traffic moving into the facility, and would enforce the terms of whatever kind of shipping document applied to any particular freight car.

■ I find and rule that the conversation between Wedge and O'Connor was a *pro tanto* abrogation of the contract between B&M and New Haven, limited to supervision of freight moving to Gardner Beef Company. I find that Wedge removed *in toto* any supervisory authority subsisting in O'Connor up to the time of that conversation to "shut off" or not "shut off" deliveries to Gardner, and I find that Wedge specifically limited O'Connor's authority thereafter with respect to Gardner to the mere ministerial function of keeping a written record of the dates and value of deliveries to Gardner. Because of this abrogation of the authority of O'Connor to exercise credit supervision over Gardner, I find that from and after the date of this conversation the duty previously upon O'Connor to enforce credit terms against Gardner was no longer upon O'Connor but was transferred to Wedge. Having no duties whatsoever by reason of this conversation, I find that O'Connor was not negligent thereafter with reference to supervising the credit status of the Gardner account.

■ I likewise rule that because of his position as a Regional Sales Manager, that because of the fact both Wedge and Solomon reported to O'Connor that the matter had been discussed with McGinnis, the President of the B&M, and because of the fact that weekly reports were made to Wedge thereafter by O'Connor, in reliance on Wedge's representation that he in turn would report to McGinnis, during a two-month period in which no one questioned this procedure, Wedge had apparent authority to remove supervision of the Gardner account from O'Connor.

Complaint dismissed. Judgment for defendant.